Joshua Upin, Esq. (Id No. 308457)
Matthew Faranda-Diedrich, Esq. (Id. No. 203541)
ROYER COOPER COHEN BRAUNFELD LLC
Two Logan Square
100 North 18th Street, Suite 710
Philadelphia, PA 19103
484-362-2631 (phone)
484-362-2630 (fax)
*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **TUNSKAI PROPERTIES, LLC** on behalf of itself and all other Class Members similarly situated**,** | : : : : | |
| *Plaintiff*, | : : | **Case No.** |
| *v.* | : : | **Complaint – Class Action** |
| **CITY OF PHILADELPHIA and DEPARTMENT OF LICENSES AND INSPECTIONS,** | : : : : : | |
| *Defendants*. | : : | |

## CLASS ACTION COMPLAINT

Plaintiff Tunskai Properties, LLC ("Tunskai" or "Plaintiff"), by and through its undersigned counsel, on behalf of itself and all other persons similarly situated (collectively, the "Class Members"), allege the following facts and claims upon knowledge as to matters relating to themselves and upon information and belief as to all other matters and, by way of this Complaint, aver as follows:

## I.
## INTRODUCTION AND SUMMARY OF THE ACTION

1.     The Philadelphia Department of Licenses and Inspections ("L&I" or "Department") has long been infamous for its systematic corruption, incompetence and chronic underfunding, all of which tragically combined in the 2013 Salvation Army building collapse, killing 6 and injuring 13.   That tragedy was supposed to usher in major changes, and many hoped that the once notoriously dysfunctional department would be subject to better oversight, properly managed, and that the safety of the citizens of Philadelphia would be its primary concern.   That, however, never happened.   Instead, the Department merely entered a new chapter of exploitation, with a primary focus on generating revenue by assessing excessive fines, facilitated by a vague and open-ended city ordinance.   That law provides L&I the opportunity to improperly generate tens if not hundreds of millions of dollars of revenue by any means necessary – often by extorting unsuspecting victims and doling out fines as a punitive and retributive weapon.   This conduct by the Department and the law permitting it are both unconstitutional, as violative of the Excessive Fines and Due Process protections of the Federal and Pennsylvania Constitutions.   Accordingly, the illegal fines extracted from thousands of unsuspecting victims must be disgorged under the common law principle of unjust enrichment.   What is more, because of the Department's insatiable greed and the special circumstances of this wide-spreading litigation, an injunction must be issued staying all execution proceedings across the Commonwealth and halting the coercive scheme, once and for all.

**II.**
**JURISDICTION & VENUE**

2.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 (federal question) based on its implications of the laws of the United States and violations of the United States Constitution.  The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.  Venue is appropriate in the Eastern District of Pennsylvania because a majority of the events complained of occurred in this District and because at least one class representative is resident here.

3.     This Court also has diversity jurisdiction over this action pursuant to 28 U.S.C. Sections 1332(d), 1453, and 1711–1715 (Class Action Fairness Act) because the aggregate amount in controversy exceeds $5 million; the class comprises at least 100 Plaintiffs; and at least one Plaintiff class member is diverse from at least one of the Defendants.

**III.**
**PARTIES**

*Plaintiff*

4.     Tunskai Properties, LLC, is a limited liability company with a principal place of business in Florida and owns the property located at 6200 Germantown Avenue, Philadelphia, PA ("Subject Property").

*Defendants*

5.     Defendant, the City of Philadelphia, is a municipal corporation of the first class situated within the Commonwealth of Pennsylvania, with a principal place of business located at 1515 Arch Street, Philadelphia, PA 19102.  During the times relevant to this Complaint the City acted as a principal and or acted through its agents, employees, and contractors, including but not limited to employees, agents and the Philadelphia Department of Licenses & Inspections.

6.      The Department of Licenses and Inspections is a subdivision of the City of Philadelphia.

**IV.**
**CLASS ACTION ALLEGATIONS**

7.      Tunskai bring this class action on behalf of itself and as a class action under Federal Rule of Civil Procedure 23 on behalf of the following Classes:

**A) THE CLASS IS COMPRISED OF ALL INDIVIDUALS WHO HAVE BEEN FINED UNDER THE FINING SCHEME DESCRIBED ABOVE (THE "CLASS")**

**B) THE SUB-CLASS IS COMPRISED OF ALL INDIVIDUALS WHO HAVE BEEN FINED UNDER THE FINING SCHEME DESCRIBED ABOVE AND WHO HAVE PAID ALL OR PART OF THE FINES THEY RECEIVED (THE "SUB-CLASS", THE MEMBERS OF WHICH, TOGETHER WITH THE MEMBERS OF THE CLASS, KNOWN AS THE "CLASS MEMBERS").**

8.      Excluded from the Class and Sub-Class are:

a)   Any Judge or Magistrate presiding over this action and members of their families;

b)   Defendants City of Philadelphia and Department of Licenses and Inspections.

c)   All persons who properly execute and file a timely request for exclusion from the Class or Sub-Class.

9.      <u>Numerosity</u>: Upon information and belief, the Class and Sub-Class for whose benefit this action is brought both include thousands of people and entities and are both so numerous that joinder of all members is impracticable.  The exact number and identities of the persons who fit within the proposed Class and Sub-Class are contained in Defendants' records and can be easily ascertained from those records.

10.     All claims in this action arise exclusively from uniform policies and procedures of Defendants as outlined below.

11.     No violations alleged in this complaint are a result of any individualized oral

communications or individualized interaction of any kind between Class Members and Defendants or anyone else.

    12.   <u>Commonality</u>: There are common questions of law and fact affecting the rights of the Class Members, including, *inter alia*, the following:

    a)  whether assessing a fine of between $300 - $2,000 per occurrence, per day violates the VIII Amendment to the U.S. Constitution; and

    b)  whether assessing a fine of between $300 - $2,000 per occurrence, per day violates Article 1, Section 13 of the Pennsylvania Constitution; and

    c)  whether assessing a fine of between $300 - $2,000 per occurrence, per day violates the XIV Amendment to the U.S. Constitution; and

    d)  whether assessing a fine of between $300 - $2,000 per occurrence, per day violates Article 1, Sections 1, 9 and 11 of the Pennsylvania Constitution; and

    e)  whether the Class Members are entitled to a declaration that Philadelphia Code, Sections 1-109(1), 1-109(2), 1-109(3), and/or Philadelphia Administrative Code, Section A-601.1 (Title 4) be revised to reflect a reasonable cap that does not deprive property owners of their entire property or otherwise infringe on the rights granted individuals pursuant to the United States Constitution and the Pennsylvania Constitution; and

    f)  whether the Class Members are entitled to preliminary injunctive relief staying all execution proceedings pending resolution of this matter; and

    g)  whether the Class Members are entitled to permanent injunctive relief setting aside all execution proceedings; and

    h)  whether the Class Members are entitled to permanent injunctive relief opening all

judgments entered; and

i) whether the Class Members are entitled to injunctive relief in the form of an order directing Defendants to send a court-approved notice to all Class Members, advising of the conduct alleged herein, as well as an order enjoining the conduct alleged herein and establishing a court-administered program to provide refunds of fines, fees or costs collected from Class Members.

13. Plaintiff is a member of the class it seeks to represent.

14. The claims of Plaintiff are not only typical of all Class Members, they are identical.

15. All claims of Plaintiff and the Class and Sub-Class all arise from the same course of conduct, policy and procedures as outlined herein.

16. All claims of Plaintiff and the Class and Sub-Class are based on the exact same legal theories.

17. Plaintiff seeks the same relief for themselves as for every other Class Member.

18. Plaintiff has no interest antagonistic to or in conflict with the Class or the Sub-Class.

19. Defendants have acted and/or refused to act on grounds generally applicable to the class, thereby making appropriate injunctive and declaratory relief for the Class and the Sub-Class as a whole.

20. Common questions will predominate, and there will be no unusual manageability issues.

21. Adequate Representation: Plaintiff will fairly and adequately protect the interests of the Class Members and have no interests antagonistic to those of the Class or the Sub-Class Plaintiff has retained counsel experienced in the prosecution of complex class actions, including

but not limited to actions against municipalities and governmental entities.

22.     Furthermore, pursuant to Federal Rule of Civil Procedure 23(b)(1), prosecuting separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members related to imposition and collection of fines, fees and charges pursuant to the code provisions at issue that would establish incompatible standards of conduct Defendants in enforcing such code provisions.

23.     And prosecuting separate actions by individual Class Members would create a risk of adjudications with respect to individual Class Members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

24.     Moreover, pursuant to Federal Rule of Civil Procedure 23(b)(2), the Defendants have acted or refused to act on grounds that apply generally to the Class and the Sub-Class in assessing and collecting fines, fees and charges pursuant to the relevant code provisions, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class and Sub-Class as a whole.

25.     <u>Predominance and Superiority</u>: This class action is appropriate for certification because questions of law and fact common to the Class Members predominate over questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy, since individual joinder of all Class Members is impracticable.

26.     Should individual Class Members be required to bring separate actions, this Court and/or courts throughout Pennsylvania would be confronted with a multiplicity of lawsuits burdening the court system while also creating the risk of inconsistent rulings and contradictory

judgments.

27.     In contrast to proceeding on a case-by-case basis, in which inconsistent results will magnify the delay and expense to all parties and the court system, this class action presents far fewer management difficulties while providing unitary adjudication, economies of scale and comprehensive supervision by a single court.

**V.**
**FACTS GIVING RISE TO THE CAUSES OF ACTION**

**I.   <u>VIOLATION NOTICES</u>**

27.     The Pennsylvania Legislature has authorized the City of Philadelphia to impose a fee of $300.00 per day for each offense under the Philadelphia Code to "[a]ny person who violates any provision of [the] code or regulations adopted thereunder; or who fails to comply with any order issued pursuant to any Section thereof; or who erects, constructs, installs, removes, alters, or repairs a structure, equipment or system in violation of the approved construction documents or directive of the code official or of a permit or certificate issued under the provisions of [the] code or the technical codes." Philadelphia Administrative Code, Section A-601.

28.     Section 1-109(1) of the Philadelphia Code states that "[u]nless otherwise provided, the penalty for violation of any provision of the Code or any regulation adopted under it is a fine not exceeding three hundred dollars ($300) for each offense. Each day the violation continues is a separate offense." Philadelphia Code, Section 1-109(1).

29.     Section 1-109(2) of the Philadelphia Code states:

> For violations that are designated elsewhere in this Code as "Class II" offenses, the maximum fine shall be as follows:
>
> (a)    for any violation committed between January 1, 2005 and December 31, 2005, seven hundred dollars ($700) for each violation; and
>
> (b)    for any violation committed on January 1, 2006 or thereafter,

one thousand dollars ($1,000) for each violation.

Philadelphia Code, Section 1-109(2).

30.    Section 1-109(3) of the Philadelphia Code states:

For violations that are designated in this Code as "Class III" offenses, the maximum fine shall be as follows:

(a)    for any violation committed between January 1, 2005 and December 31, 2005, seven hundred dollars ($700) for each violation;
 (b)    for any violation committed between January 1, 2006 and December 31, 2006, one thousand one hundred dollars ($1,100) for each violation;
(c)    for any violation committed between January 1, 2007 and December 31, 2007, one thousand five hundred dollars ($1,500) for each violation;
(d)    for any violation committed between January 1, 2008 and December 31, 2008, one thousand nine hundred dollars ($1,900) for each violation; and
 (e)   for any violation committed on January 1, 2009 or thereafter, two thousand dollars ($2,000) for each violation.

Philadelphia Code, Section 1-109(3).

31.    On December 20, 2017, the Philadelphia Department of Licenses and Inspections began issuing notices to Tunskai that its property was in violation of Title 4 of the Philadelphia Administrative Code, Section A-601.

32.    Pursuant to Philadelphia Code, Section 1-109, L&I fined Tunskai $7,200 *per day.*

33.    Plaintiff was cited and ordered to pay a total of $2,045,100.

## II.    CREATION OF THE DEPARTMENT OF LICENSES AND INSPECTIONS

34.    L&I is tasked with issuing construction permits, ensuring building safety and enforcement of related city ordinances and zoning regulations, through inspections and assessing fines and penalties for violations.  (*See* L&I 2019-2021 Strategic Report at p. 4, attached hereto as Exhibit A).

35.     The Department was formed in 1951 as part of the Home Rule Charter to "centralize licenses, inspections and control the fees out for those services." (L&I Report at p. 8).

36.     L&I was created in response to decade's long corruption within Philadelphia's City Hall, and to "put most licensing and regulatory enforcement in one place to *better guard against corruption."* (L&I Report at p. 9).

37.     Although L&I's primary mission is to ensure building safety, the Department is better known for its systematic corruption, incompetence and chronic underfunding, as evidenced by numerous scandals involving extortion and bribery (among others) over the years.

38.     In fact, according to reports, since the Department's inception, more than 50 employees have been fired or arrested for some corruption or significant incompetence. (https://billypenn.com/2015/07/14/bribes-strippers-corruption-and-red-tape-philadelphias-department-of-licenses-and-inspection/) (last visited 8/6/20).

39.     To that end, during L&I's early years, "10 inspectors were fired for accepting bribes, two were arrested for accepting money from 'permit expediters' … and four others were fired for accepting payoffs from other businesses and individuals to overlook code violations." (Id.)

40.     In 1969, the Deputy Commissioner was charged with 22 counts of bribery and extortion after it was discovered he took money from businesses in exchange for favorable outcomes relating to code violations.  (Id.)

41.     In 1991, four L&I employees were charged with taking money from building contractors.  It was reported that one of the employees was caught on tape by the FBI counting cash in his office.  (Id).

42.    Scandal hit the department again in 2010 when Kenneth Gassman, an L&I inspector, was charged extortion for allegedly using his position "in an effort to compel the owner of a commercial property to sell the property to him."

43.    Gassman reportedly "engaged in conduct designed to inhibit the property owner's ability to sell the property to others and to compel the owner to sell the property to him. Gassman caused other L&I inspectors to inspect the property and issue violations, including a bogus violation for operating an unlicensed auto repair business. Gassman is further alleged to have vandalized the property, removed for sale signs, and used aliases to contact the city's 311 system with complaints that the property was unsafe. According to the indictment, Gassman's conduct caused the owner of the property to spend money to make repairs and to contest the L&I violations. https://archives.fbi.gov/archives/philadelphia/press-releases/2010/ph082410.htm    (last    visited 8/7/20).

44.     In addition to scandal, L&I's reputation has been marred by incompetence.

45.    For example, in 2010, a city inspector approved the unsafe installation of a security gate at a Rita's Water Ice location. Five years later, a three year old was tragically killed when the gate fell on top of her. It was reported that L&I tried to cover up their mistake after the accident. https://billypenn.com/2015/10/13/the-fbi-is-asking-around-are-phillys-licenses-and-inspections-officials-taking-bribes/ last visited 8/6/20

46.    The Department has also consistently struggled with underfunding and was once referred    to    as    "the    underfed    child    of    city    government." https://www.phillymag.com/news/2016/06/04/this-was-no-accident/ last visited 8/7/20.

47.     These systematic and long-standing issues at L&I ultimately culminated in the 2013 Salvation Army building collapse, which took the lives of six innocent people, injured 13 others, and resulted in the criminal indictment of a handful of individuals.

### III.    THE SALVATION ARMY TRAGEDY AND THE SUBSEQUENT L&I REPORT

48.     On the morning of June 5, 2013, innocent donors, shoppers, and employees of the Philadelphia Salvation Army thrift stores ("Salvation Army") were tragically buried alive when a neighboring wall fell while under demolition, crashing into the store, in a preventable tragedy (the "Salvation Army Tragedy").

49.     The contractor working on the demolition, who had a criminal record, was ultimately convicted of involuntary manslaughter.  (L&I Report at p. 15).

50.     L&I issued permits for the demolition without any due diligence and failed to properly ensure that proper safety measures were in place.

51.     In fact, L&I knew that warnings of potential problems were ignored, short cuts were taken, and safety precautions were passed by.

52.     Following the Salvation Army Tragedy, Philadelphia Mayor Michael A. Nutter ("Mayor Nutter") formed the Special Independent Advisory Commission to Review and Evaluate the Philadelphia Department of Licenses and Inspections (the "Commission"), comprised of experts asked to examine the building collapse.

53.     The Commission issued its final report to Mayor Nutter on September 25, 2014 (the "L&I Report"; a true and correct copy of which is attached hereto as Exhibit B).

54.      The report found that "L&I is a department fragmented by divergent mandates accumulated over decades of mission expansion, chronic underfunding and leadership with differing goals and methods."  (L&I Report at p. 5).

55.     The report further noted that L&I resources were inadequately used "with little lasting impact or focus on long-term safety or solutions."  (L&I Report at p. 5)

56.     The L&I Report detailed significant deficiencies within L&I, including (1) inadequate regulatory controls, (2) lack of effective coordinated action (internally, as well as with the City Law Department), (3) lack of adequate safety regulations, including regulations relating to demolition, (4) insufficient staffing and proper training, and (5) weak financial controls.  (Id. generally)

57.     The Commission made 37 recommendations for important changes to L&I and Mayor Nutter created new positions including a Chief Safety Officer, and a new organizational placement of L&I under the Deputy Mayor for public safety.  (2014 OIG Report at p. 24).

IV.     **CONTINUING MALFEASANCE AT THE DEPARTMENT**

58.     Unfortunately, L&I learned little from the Salvation Army Tragedy, and it continues to put the Department's interest above the safety of the city and its residents.

59.     The Salvation Army Tragedy was supposed to effectuate major change, with the hope that the once notoriously dysfunctional L&I would be reorganized, properly managed and staffed to carry out its mission to ensure the safety of Philadelphia residents.

60.     Those noble objectives, however, were never achieved.  Instead, corruption, greed, and manifest incompetence continue to plague L&I.

61.     Indeed, since the Salvation Army Tragedy, L&I has continued to have recurring scandals.

62.     For example, according to the Office of Inspector General of Philadelphia's 2014 Report (the "2014 OIG Report"; attached hereto as Exhibit C), an L&I inspector was caught extorting a Philadelphia homeowner who was having issues with a housing project.  (Id. at p. 15)

The L&I inspector "asked for a cash payment in exchange for general contracting services and special treatment at L&I. (Id.)  The Inspector also suggested that if the homeowner hired him as a 'handyman,' he could expedite the inspection and permitting processes."  (Id.)

63.     Even more recently in 2019, Philadelphia City Councilman Bobby Henon was indicted on corruption charges, including a charge that he (along with the electric union), directed L&I    inspectors    to    punish    their    political    and    business    adversaries. https://northeasttimes.com/2019/01/30/bobby-henon-charged-in-corruption-indictment/_____ (last visited 8/6/20)

64.     Beyond scandal, the Department also continues to be plagued by dysfunction and incompetence.

65.     The 2014 OIG Report noted that it received "many complaints from members of the public reporting unlicensed or uninsured contractors, unsafe construction or demolition practices and various forms of contractor fraud throughout the city."  (2014 OIG Report at p. 24)

66.     L&I was the subject of a scathing article in 2015 that called the Department out for neglecting to follow new rules put in place following the Salvation Army Tragedy.   The Department continued to take heat for failing to address the growing number of buildings that, according    to    the    article,    remained    in    imminent    danger    of    collapse. (https://billypenn.com/2015/11/10/carlton-williams-what-you-need-to-know-about-the-head-of-the-embattled-li/) (last visited 8/6/20)

67.     In 2015, the City's Controller issued an investigative report finding that, despite the Salvation Army Tragedy, it appeared to be business as usual at L&I: "[s]ince taking office almost 10 years ago, the City Controller has issued several audits and reports that implicated major deficiencies and lack of controls for the functions, procedures and staffing levels within the

Department of Licenses and Inspections (L&I).  It wasn't until after the deadly June 2013 Market Street building collapse that the City began to initiate new regulations and oversight standards for L&I in relation to demolitions and construction services.  However, as revealed in a performance audit issued by the Controller one year after the collapse, many of these new procedures were not being followed."

68.     In fact, according to the *Inquirer,* L&I failed to follow new inspection guidelines in more than 80 percent of demolitions throughout the first eight months of 2015. https://www.inquirer.com/philly/news/20151025_What_new_building_inspection_guidelines_.html last visited 8/6/20.

69.      The City Controller's office also discovered in 2015 that L&I "allowed uncertified trainees to conduct inspections and that the computer system [it] used [ ] (called HANSEN) allowed staff to easily manipulate or overwrite inspection data at any time … ." (https://billypenn.com/2015/10/13/the-fbi-is-asking-around-are-phillys-licenses-and-inspections-officials-taking-bribes/) last visited 8/7/20

70.     It was further reported that L&I gave preferential treatment to a contractor who performed illegal demolitions, who was placed on the City's preferred contractor list. (https://billypenn.com/2015/10/13/the-fbi-is-asking-around-are-phillys-licenses-and-inspections-officials-taking-bribes/) last visited 8/7/20

71.     In an even greater demonstration of incompetence and complete indifference to its own rules, L&I reportedly allowed uncertified inspectors to conduct 600 inspections in one week. https://www.phillymag.com/property/2015/03/23/philadelphia-licenses-and-inspections/last visited 8/6/20

72.    In that same report, unnamed veteran L&I employees were quoted as saying that "they can't recall training in which new hires were ordered to assess unsafe buildings, which is often present complex and dangerous problems." (Id.) One employee went as far as to call the entire thing a "cover up" so that "the commission could clean up the list of uninspected buildings." (Id.)

73.    Understaffing also persisted following the Salvation Army Tragedy.  An April 2016 study by Temple University's Beasley School of Law, "Strategies to Address Unsafe and Unhealthy Housing in Philadelphia" (the "Temple Study"; attached hereto as Exhibit D), highlighted the problem and the impact understaffing had on the quality of the Department noting that "[t]he fact that there are only 300 L&I employees for all of Philadelphia prevents the department from being as effective as they would like to be." (Temple Study at p. 13).

74.    And finally, underfunding continues to be a major problem for L&I, with the Department lacking proper budgetary support from the City.

75.    The Temple Study notes: "The Department of Licenses and Inspections was one of the hardest hit by the economic downturn of 2008. L+I's total budget and staff were greatly diminished in the years following.  By 2013, L+I's total budget was decreased by 30 percent and its staff drifted to barely above 300, a 20 percent drop." (Temple Study at p. 11).

76.    Although current Mayor Jim Kenny promised additional funding, upon information and belief, the level of funding supplied has not kept pace with the demands of the Department.

77.    In 2019, L&I sought an additional $2 million from the city to hire more inspectors. https://www.nbcphiladelphia.com/news/local/philadelphia-licenses-and-inspections-department-seeks-2-million-in-new-funding-to-beef-up-investigations/186040/  Last visited 8/6/20

78.     Unfortunately, L&I's well-documented systemic incompetence, chronic underfunding, and corruption was more recently combined with one more thing, *opportunity* – namely, the opportunity to use an open-ended and vague provision of the Philadelphia Code to extract excessive fines from the citizens and businesses of Philadelphia.

79.     In so doing, L&I has created a lucrative scheme using the daily accruing fine provisions of the Philadelphia Code as a way to extort vast amounts of money.

80.     Upon information and belief, in just the last four (4) years alone, L&I has generated at least tens of millions of dollars from this criminal enterprise.

## V.    L&I's ENFORCEMENT REGIME- PUNISH SO-CALLED "VIOLATORS" TO GENERATE ADDITIONAL REVENUES FOR ITSELF AND THE CITY

81.     Section 109 of the Philadelphia Code and A-601.1 (Title 4) of the Philadelphia Administrative Code (collectively, the "*Code Provisions*") set forth a fine provision providing a daily fine, per violation, ranging from $300 per day to $2,000 per day.  Philadelphia Code, Section 1-109; Philadelphia Administrative Code, Section A-601.1.

82.     Although the maximum fine per violation per day is capped, there is no maximum cumulative fine under the Code Provisions.

83.     Although L&I boasts that it's primary objective is to   "… champion[] building safety in Philadelphia by enforcing compliance with City Codes … [,]"  its enforcement measures are clearly driven by an ulterior motive to generate money.  (L&I 2019-2021 Strategic Plan at p. 5).

84.     While L&I may claim that its primary focus is safety, in practice the Department imposes a financial obligation that must be satisfied before the unsafe condition giving rise to the violation can be remedied.

85.     To that end, an alleged "violator" is unable to obtain necessary permits and licenses required to cure the deficiencies giving rise to the fine until *after* the fine is paid in full.

86.     Despite claiming that it "achieves code compliance through *collaboration, education, and effective enforcement measures* …" (see Exhibit A at p. 6), it is blatantly obvious that the objective of L&I's code enforcement practice is to raise funds, and not deter non-compliance.

87.     In sum, it is clear that L&I's objective in assessing fines is not to remediate the so-called "violations" but rather to continue the extortionist conduct it has long been known for – coercing victims to hand over money, or else risk further damage to themselves and their properties.

88.     This scheme has worked as evidenced by actual revenue figures reported by L&I in recent years, as well as City projections for non-tax revenues expected during the years 2020-2025.

89.     For example, although total appropriations for the Department went down from $39,244,283 in 2017 to $36,517,288 in 2018, L&I more than made up for that gap in funding by reflecting an increase in "Non – Tax Revenue" – which is where violation fine revenue is recorded – of $4,250,000 ($59,211,000 in 2018 up from $54,961,000 in 2017).  (Annual Auditor's Report on Philadelphia City Departments Fiscal Year 2017 and Annual Auditor's Report on Philadelphia City Departments Fiscal Year 2018, attached hereto as Exhibits E and F.)

90.     And between its 2019 and 2020 annual review of the City's Five Year Plan, the City Controller has miraculously projected staggering increased projections in "Locally Generated Non-Tax Revenue" (of which L&I violation fine revenue is a subset) of $42,943,000 in 2021 (from $314,947,000 to $357,890,000), $71,123,000 in 2022 (from $316,376,000 to $387,499,000),

$34,435,000 in 2023 (from $326,371,000 to $360,806,000 and $43,384,000 in 2024 (from $319,587,000 to $362,971,000), as follows:

| | | | | | | |
|---|---|---|---|---|---|---|
| **City of Philadelphia - Office of the Director of Finance** | | | | | | |
| **Forecasted General Fund Statements of Operations** | | | | | | |
| **Fiscal Years Ending June 30, 2020 through June 30, 2024** | | | | | | |
| (Amounts in thousands) | | | | | | |
| NO. | ITEM | FY 2020 Adopted | FY 2021 Estimate | FY 2022 Estimate | FY 2023 Estimate | FY 2024 Estimate |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| | **OPERATIONS OF FISCAL YEAR** | | | | | |
| | **REVENUES** | | | | | |
| 1 | Taxes | 3,636,492 | 3,766,841 | 3,877,365 | 3,985,106 | 4,077,837 |
| 2 | Locally Generated Non-Tax Revenues | 353,328 | 314,947 | 316,376 | 326,371 | 319,587 |
| 3 | Revenue from Other Governments | 847,172 | 877,139 | 899,389 | 935,426 | 980,943 |
| 4 | Sub-Total (1 thru 3) | 4,836,992 | 4,958,927 | 5,093,130 | 5,246,903 | 5,378,367 |
| 5 | Revenue from Other Funds of City | 81,011 | 63,879 | 65,410 | 65,883 | 66,264 |
| 6 | **Total Revenue and Other Sources** (4)+(5) | 4,918,003 | 5,022,806 | 5,158,540 | 5,312,786 | 5,444,631 |

| | | | | | | |
|---|---|---|---|---|---|---|
| **City of Philadelphia - Office of the Director of Finance** | | | | | | |
| **Forecasted General Fund Statements of Operations** | | | | | | |
| **Fiscal Years Ending June 30, 2021 through June 30, 2025** | | | | | | |
| (Amounts in thousands) | | | | | | |
| NO. | ITEM | FY 2021 Adopted | FY 2022 Estimate | FY 2023 Estimate | FY 2024 Estimate | FY 2025 Estimate |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| | **OPERATIONS OF FISCAL YEAR** | | | | | |
| | **REVENUES** | | | | | |
| 1 | Taxes | 3,330,098 | 3,699,848 | 3,903,572 | 4,049,008 | 4,193,105 |
| 2 | Locally Generated Non-Tax Revenues | 357,890 | 387,499 | 360,806 | 362,971 | 423,306 |
| 3 | Revenue from Other Governments | 768,197 | 832,395 | 882,596 | 929,647 | 953,808 |
| 4 | Sub-Total (1 thru 3) | 4,456,185 | 4,919,742 | 5,146,974 | 5,341,626 | 5,570,219 |
| 5 | Revenue from Other Funds of City | 125,608 | 61,772 | 63,315 | 63,801 | 64,311 |
| 6 | **Total Revenue and Other Sources** (4)+(5) | 4,581,793 | 4,981,514 | 5,210,289 | 5,405,427 | 5,634,530 |

91.    This is a collective $191,885,000 increase over the prior 2021-2024 projections.

92.     Upon information and belief, a large subset of these vast increases is directly related to the anticipated collection of fine revenue by L&I.

93.     In fact, between 2018 and 2019 the law department has noted an increase in fine and fees collections from $2.1 million to $3.35 and anticipates increases in subsequent years. (See, the City of Philadelphia Law Department 2018 and 2019 annual reports, attached hereto as Exhibits G and H.)

## VI.     THE SCHEME VISITED UPON PLAINTIFF – OVER $2,000,000 IN EXCESSIVE FINES ENACTED AS A PUNISHMENT

94.     Plaintiff owns certain real property located in Philadelphia known as 6200 Germantown Avenue, Philadelphia PA 19144 (the "Subject Property").

95.     As the result of a number of alleged violations at the Subject Property in late 2017 and 2018, the City filed an action against Plaintiff seeking monetary damages and injunctive relief, *City of Philadelphia v. Tunskai Properties, LLC,* C.A. No. 190801541 (Ct. Com. Pl. Phila. Co.) (the "*Underlying Lawsuit*").

96.     In the Underlying Lawsuit, the City sought and was ultimately awarded a cumulative daily fine of $7,200 for the alleged violations pursuant to the Code Provisions.

97.     The Final Order in the Underlying Lawsuit calculated total fines of $2,045,100 (the "*Excessive Fine*") and judgment was later entered in that same amount.

98.     The fair market value of the Subject Property is not greater than $250,000, meaning that the Excessive Fine charged to Plaintiff is nearly 10 times the property value.

99.     Both before and after the Excessive Fine was levied, Plaintiff has repeatedly and earnestly attempted to cure the alleged defaults, but Defendants have stymied those efforts while at the same time doggedly pursuing collection of the Excessive Fine.

100.    After getting the runaround through usual channels at L&I, in December of 2019, a representative of Plaintiff, Ayal Keren, took the extraordinary and good faith action of flying to Philadelphia from Florida to attempt to meet with Deputy City Solicitor Brendan J. Philbin regarding curing the alleged violations.  Mr. Keren requested a meeting with Mr. Philbin to address and, hopefully, remedy the issues.

101.    Mr. Philbin refused to meet with Mr. Keren, however, and Plaintiff's efforts to cure the alleged violations continued to be thwarted by a bureaucratic regime focused on only one thing – collecting the Excessive Fine at all costs.

102.    Indeed, although the City clams the Excessive Fine is warranted because of alleged imminently dangerous and life threatening conditions, the City has taken absolutely no remedial action, instead singularly focused on its collection efforts.  For example, the Final Order in the Underlying Lawsuit permitted the City to take immediate action to cease operations at and secure the Subject Property, but the City has never done so.  Clearly then, the health and wellbeing of the citizens of Philadelphia is of little importance to Defendants – all that appears to matter is that the fine spigot remains open with cash flowing back to L&I and to the City.

## VI.
## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION:
### 42 U.S.C. § 1983

**Violation of the Excessive Fines Clause of the VIII Amendment to the U.S. Constitution**
**(As Against All Defendants on behalf of the Class)**

103.    Plaintiff repeats and re-alleges each and every allegation contained above as though fully set forth herein.

104.    The fines of between $300 to $2,000 per occurrence, per day plus fees and costs that the City of Philadelphia imposes on property owners under Philadelphia Code, Sections 1-

109(1), 1-109(2), 1-109(3), and/or Philadelphia Administrative Code, Section A-601.1 (Title 4), are grossly disproportionate to the amount of and severity of the underlying violation.

105.    In light of the minor nature of the violations and their financial effect on members of the plaintiff Class, the aforementioned provisions provide for fines that are punitive in nature, and are grossly excessive and disproportionate, particularly when accumulated to an amount that surpasses the property value of a member of the class—forcing them to forego their entire property over a series of violations set out by the City of Philadelphia.

106.    Moreover, the accumulation of fines can exceed the property value of a home or business in an unlimited capacity, even resulting in millions of dollars of fines related to a property worth less than $10,000.00, which would force owners to turn over properties, place owners in bankruptcy and force them to sell all their assets and be indebted in an amount they simply cannot repay.

107.    As a direct and proximate result of the outrageous fines and fees charged by the City of Philadelphia, Plaintiff and the Class Members have been deprived of their right to be free from the imposition of excessive fines as guaranteed to them under the VIII Amendment to the U.S. Constitution, which is hereby actionable pursuant to the Civil Rights Act, 42 U.S.C. § 1983.

108.    Accordingly, Plaintiff and the Class Members have suffered damages and/or are entitled to restitution in an amount to be proven at trial.

109.    Pursuant to 42 U.S.C. § 1988 Plaintiffs and the Class Members further seek their costs and attorneys' fees incurred as a result of this lawsuit.

### SECOND CAUSE OF ACTION:

**Violation of the Excessive Fines Provision of Article 1, Section 13 of the Pennsylvania Constitution**
**(As Against All Defendants on behalf of the Class)**

110.    Plaintiff repeats and re-alleges each and every allegation contained above as though fully set forth herein.

111.    The fines of between $300 to $2,000 per occurrence, per day plus fees and costs that the City of Philadelphia imposes on property owners under Philadelphia Code, Sections 1-109(1), 1-109(2), 1-109(3), and/or Philadelphia Administrative Code, Section A-601.1 (Title 4), are grossly disproportionate to the amount of and severity of the underlying violation.

112.    In light of the minor nature of the violations and their financial effect on members of the plaintiff Class, the aforementioned provisions provide for fines that are punitive in nature, and are grossly excessive and disproportionate, particularly when accumulated to an amount that surpasses the property value of a member of the class—forcing them to forego their entire property over a series of violations set out by the City of Philadelphia.

113.    Moreover, the accumulation of fines can exceed the property value of a home or business in an unlimited capacity, even resulting in millions of dollars of fines related to a property worth less than $10,000.00, which would force owners to turn over properties, place owners in bankruptcy and force them to sell all their assets and be indebted in an amount they simply cannot repay.

114.    As a direct and proximate result of the outrageous fees charged by the City of Philadelphia, Plaintiff and the Class Members have been deprived of their right to be free from the imposition of excessive fines as guaranteed to them under Article 1, Section 13 of the Pennsylvania Constitution.

115.    Accordingly, Plaintiff and the Class Members have suffered damages and/or are entitled to restitution in an amount to be proven at trial.

116.    Pursuant to Article 1, Section 13 of the Pennsylvania Constitution, Plaintiffs and the Class Members further seek their costs and attorneys' fees incurred as a result of this lawsuit.

### THIRD CAUSE OF ACTION:

**VIOLATION OF THE RIGHT UNDER THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION TO DUE PROCESS (As Against All Defendants on behalf of the Class)**

117.    Plaintiff repeats and re-alleges each and every allegation contained above as though fully set forth herein.

118.    The Fourteenth Amendment of the United States Constitution, section 1, prohibits states from depriving any person of life, liberty, or property, without due process of law.

119.    The Defendants' excessive fines scheme and their enforcement, as well as the execution proceedings that result from the same, as alleged above, have deprived Plaintiff and the Class Members of their property in violation of due process, resulting in a wide reach into their personal and real property.

120.    As a direct result of such violation of due process, Plaintiff and the Class Members have been damaged.

121.    The Plaintiff and the Class Members are entitled to the recovery of damages, and appropriate injunctive and declaratory relief, as alleged herein.

### FOURTH CAUSE OF ACTION:

**VIOLATION OF THE RIGHT UNDER ARTICLE 1, SECTIONS 1, 9, AND 11 OF THE PENNSYLVANIA CONSTITUTION TO DUE PROCESS (As Against All Defendants on behalf of the Class)**

115.    Plaintiff repeats and re-alleges each and every allegation contained above as though fully set forth herein.

116.    Article 1, Sections 1, 9, and 11 of the Pennsylvania Constitution, prohibit the deprivation of a property right or other interest that is constitutionally protected.

117.     The Defendants' excessive fines scheme and their enforcement, as well as the execution proceedings that result from the same, as alleged above, have deprived Plaintiff and the Class Members of their property in violation of due process, resulting in a wide reach into their personal and real property.

118.     As a direct result of such violation of due process, Plaintiff and the Class Members have been damaged.

119.     The Plaintiff and the Class Members are entitled to the recovery of damages, and appropriate injunctive and declaratory relief, as alleged herein.

### FIFTH CAUSE OF ACTION:
### Unjust Enrichment/Disgorgement – Creation of a Common Fund
### (As Against All Defendants on behalf of the Sub-Class)

120.     Plaintiff repeats and re-alleges each and every allegation contained above as though fully set forth herein.

121.     Plaintiff and the Class Members assert a common law claim for unjust enrichment.

122.     By means of the Defendants' wrongful conduct alleged herein, the City of Philadelphia and the Department of Licenses and Inspections knowingly imposed fines, fees and charges on Plaintiff that were unfair, unconscionable, oppressive, and in violation of federal and Pennsylvania law.

123.     The Defendants knowingly received and intends to further receive and retain funds from fines imposed Plaintiff and all other individuals that paid per occurrence, per day fines ranging from $300 - $2,000, and cumulatively exceeding their property value.  In so doing, the Defendants acted with conscious disregard for the rights of Plaintiff and each of the individual property owners.

124.    As a result of the Defendants' wrongful conduct as alleged herein, the Defendants have been unjustly enriched at the expense of, and to the detriment of, Plaintiff and each of the property owners.

125.    The Defendants' unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

126.    It is inequitable for the Defendants to be permitted to retain tens, if not hundreds, of millions of dollars from fines they have extorted from property owners whose properties are worth a fraction of those fines.

127.    The financial benefits derived by the Defendants rightfully belong to Plaintiff and each of the individual property owners.  Accordingly, the Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiff and each of the individual property owners all wrongful or inequitable proceeds received by it.

128.    A constructive trust should also be imposed upon all wrongful or inequitable sums received by the Defendants traceable to Plaintiff and each of the individual property owners.

129.    Plaintiff and each of the individual property owners have no adequate remedy at law.

130.    There is no basis in law and it is legally indefensible for the Defendants to retain any of the sums it has received from collecting fines in an unlimited capacity.

131.    If allowed to retain the millions worth of fines, fees and charges from property owners, the Defendants would be unjustly enriched.

### SIXTH CAUSE OF ACTION:

**PRELIMINARY AND PERMANENT INJUNCTION TO STAY AND SET ASIDE EXECUTION AND OPEN ALL JUDGMENTS ENTERED PURSUANT TO THE ALL WRITS ACT (As Against All Defendants on behalf of the Class and Sub-Class)**

132.   The All Writs Act, 28 U.S.C. Sec. 1651(a), authorizes the Supreme Court and all courts established by Act of Congress to issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.

133.   Among other things, the All Writs Act grants the Supreme Court and all courts established by Act of Congress the power to stay state court judgments pending review.

134.   The Third Circuit has repeatedly recognized that district courts have authority to issue injunctions under the All Writs Act when confronted with a pattern of conduct that is abusive and when the district court believes that the abusive conduct will continue if not restrained.

135.   Furthermore, the Third Circuit considers the nature of the federal action, the actions of the state court, as well as principles of federalism and comity in exercising the power to issue injunctions under the All Writs Act and the related Anti-Injunction Act, 28 U.S.C. Sec. 2283.

136.   District Courts in our Circuit have issued injunctions staying state execution proceedings when faced with class actions challenging the lawfulness of the underlying law upon which those execution proceedings are based.

137.   A preliminary injunction staying execution proceedings involving Class Members is required because Plaintiff and the Class Members have no other adequate means to attain the relief they desire, and because issuing such an injunction would comply with the requirements of the All Writs Act and the Anti-Injunction Act.

138.   A preliminary injunction is further appropriate under the circumstances to maintain the *status quo* until a full hearing and determination on the merits of Plaintiff's constitutional claims, and without such an order staying proceedings thousands of Class Members would be faced with excessive and otherwise unconstitutional fines, and the related deprivation of property ensuing from same

139.    A permanent injunction setting aside execution proceedings and opening judgments entered against Class Members is also required because Plaintiff and the Class Members have no other adequate means to attain the relief they desire, and because issuing such an injunction would comply with the requirements of the All Writs Act and the Anti-Injunction Act.

140.    Plaintiff's right to issuance of the writ requested herein is clear and indisputable based on the clear unconstitutionality of the Code Provisions.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of itself and all other similarly situated, pray for a judgment against Defendants as follows:

1.    For an order certifying the Class and the Sub-Class, pursuant to Rule 23, appointing Plaintiff as representative of the Class, and appointing the law firm representing Plaintiff as counsel for the Class and the Sub-Class;

2.    For a writ issuing preliminary injunctive relief staying all execution proceedings against Class Members pending resolution of this matter;

3.    For a declaration that Philadelphia Code, Sections 1-109(1), 1-109(2), 1-109(3), and/or Philadelphia Administrative Code, Section A-601.1 (Title 4) is invalid on its face and as applied by the Defendants pursuant to 28 U.S.C. § 2201;

4.    For a declaration that Philadelphia Code, Sections 1-109(1), 1-109(2), 1-109(3), and/or Philadelphia Administrative Code, Section A-601.1 (Title 4) be revised to reflect a reasonable cap that does not deprive property owners of their entire property or otherwise infringe on the rights granted individuals pursuant to the United States Constitution and the Pennsylvania Constitution;

5.    For a writ issuing permanent injunctive relief setting aside all execution

proceedings against Class Members;

6.     For a writ issuing permanent injunctive relief opening all judgments entered against Class Members;

7.     For an Order requiring a refund to the Class Members of all fines, fees and charges collected by Defendants on account of the Code Provisions;

8.     For an Order requiring disgorgement of all of the ill-gotten gains derived by the Defendants from its aforementioned misconduct into a common fund for the benefit of Plaintiff and the Class Members;

9.     For an award of pre-judgement interest at the maximum rate permitted by applicable law;

10.     For an award of the costs incurred in pursuing this action, including, but not limited to, reasonable attorney's fees pursuant to applicable law, contract, and/or equitable principles; and

11.     For such other relief as deemed just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all claims so triable.

**Royer Cooper Cohen Braunfeld LLC**

By: /s/ Joshua Upin

Joshua Upin, Esquire
Matthew Faranda-Diedrich, Esquire
Id. Nos. 308457/203541
jupin@rccblaw,com
mfd@rccblaw.com
Two Logan Square
100 N. 18th St., Suite 710
Philadelphia, PA 19103
T: (215) 839-1000

F: (484) 362-2630

Dated:  August 17, 2020